UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FIBERMARK, INC.,

                        Plaintiff,

      v.                                                  7:02-cv-0517

BROWNVILLE SPECIALTY PAPER
PRODUCTS, INC.,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

**I.    INTRODUCTION**

Plaintiff Fibermark, Inc. ("Fibermark") commenced the instant action asserting claims under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, N.Y. GEN. BUS. LAW §§ 349 and 360-l, and a common law claim of unfair competition arising out of Defendant Brownville Specialty Paper Products, Inc.'s ("Brownville") production and sale of Type II ½ and/or Type III pressboard with a "mottled" appearances printed thereon. Presently before the Court is Defendant's motion for summary judgment seeking dismissal of the Complaint.

**II.    FACTS**

Pressboard is a dense, rigid form of paperboard. Some forms of pressboard consist of multiple layers. Pressboard is categorized based on density, rigidity, and finish. Density of paper is the measure of paper fiber weight per unit volume. Three grades of

pressboard are known as Type I, Type II, and Type III. Type I is the most dense and rigid grade of pressboard.

Fibermark manufactures all three grades of pressboard. Currently, Fibermark is the only manufacturer of Type I pressboard in the United States. Fibermark's Type I pressboard is known as Genuine Pressboard™. When a clear acrylic coating and leather grain embossing are added, it is known as PressGuard®. Pressboard manufacturers sell their products to converters. Converters purchase the pressboard and then convert it into a finished good (such as file folders, three-ring binders, file folders, notebooks, and report covers) for sale to retailers.

FiberMark manufactures[1] Type I pressboard by laminating two 7-ply paperboard sheets[2] back to back and subsequently passing the laminated fourteen-ply sheet through a piece of equipment known as a glazer. During the lamination process, two rolls of half stock are unwound and a laminating adhesive is applied to the backside of one of the half stocks. One half stock is then joined with the other half stock. During this process, the product is moisturized. After laminating and moisturizing, the product is wrapped in plastic and stored for a period of time to allow the moisture to equalize throughout the roll. Thereafter, the product is sent through the glazer. The glazing process includes unwinding the laminated fourteen-ply sheet and passing it between a loaded glazing wheel and a bedplate moving back and forth across the sheet. There are many variables associated with the glazing process, including the pressure and speed of the glazing head, the speed of the laminated

---

[1] Needless to say, the following description of the manufacturing process is simplified and incomplete.

[2] Each seven-ply sheet is known as "half stock."

pressboard, temperature, moisture level of the laminated pressboard, and condition of the glazing head. During the glazing process, the pressboard is densified. Densificiation is the process whereby the cellulose fibers are compressed and the water squeezed out. The water is pushed along the plane of the web. The path the water takes becomes darkened due to changes in optical properties and relocation of dyed fines flowing with the water.

Mottle is a natural property exhibited to a certain extent by all paper and paperboard. This is caused by the uneven distribution of paper fibers. All paper and paperboard contain areas of both light and heavy concentration of paper fibers. Areas of paperboard with heavier concentrations of paper fibers appears darker than those areas with lesser concentrations. Mottle is the uneven appearance of paperboard observed when light shines upon unequal concentrations of paper fibers in an area of paperboard. Thus, the appearance of mottle may differ in shape, size, and uniformity. Mottle may be enhanced or minimized in appearance.

According to Plaintiff, its products do not exhibit "generic" mottle, but possess a type of mottle (or design) that is specifically obtained through the control of such factors as: the selection of pulps and secondary fibers; the refining of the pulps and secondary fibers; the selection of dyes; the selection and addition of wet end additive chemicals, the forming of the half stocks, the pressing, drying, surface sizing and machine calendaring operations; the selection of adhesives for the half stock; the lamination and moisturizing process; hermetically sealing the product prior to glazing; and the glazing operation itself. The mottle on Plaintiff's Type I product is not uniform and varies from roll to roll. However, Plaintiff endeavors to carefully control the mottled appearance of its products throughout the manufacturing process. As a result, although not uniform, there is some level of consistency

in the mottled appearance of Plaintiff's Type I product. To this end, Plaintiff examines the appearance of mottle present on each role of its Type I product. The appearance of mottle present on each roll of product is rated by the machine operators on a scale of one to five.[3] There is some difference in the degree of mottle between each scale level. The scale rating is performed by comparing the appearance of the mottle present on the rolls to samples posted at the production facility.

The president of Brownville, Eugene Rood, is a former employee of FiberMark's predecessor, Boise Cascade. Rood entered into an arrangment with Steve Steidle to market and sell Brownville's products. Steidle was FiberMark's Vice President of Sales and Marketing until 1999. Defendant does not produce a Type I product. Instead, it produces what it claims to be a Type II ½ coated and embossed pressboard product with a marbled or mottled appearance (the Mansfield Cover). By definition, defendant's product is an imitation pressboard. Defendant's products do not have the same technical specifications as Plaintiff's Type I products. The Mansfield Cover's mottled, or marbled, appearance is not the result of the manufacturing process. Rather, it is created by printing a pattern on the surface of the pressboard with an inked print roll or cylinder. Because it is printed on the pressboard, Defendant's mottling is uniform. It appears that Defendant printed mottling on its product to satisfy the concerns of the converters. The converters were of the opinion that any alternative to Plaintiff's product would have to be mottled.

None of Plaintiff's direct or immediate customers have notified Plaintiff about being confused as to the identity of the manufacturer or source of Defendant's product.

---

[3] A rating of 4 or 5 is acceptable for shipment. A rating of 3 requires further processing to achieve an acceptable rating. A rating of 1 or 2 is unacceptable.

### III.	STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  With this standard in mind, the Court will address the defendant's motion.

### IV.	DISCUSSION

Plaintiff asserts a claim against Defendant pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Essentially, Plaintiff claims that the mottled appearance on its

Type I product is a protectable trade dress and that Defendant has violated the Lanham Act by selling a product that mimics Plaintiff's trade dress. Defendant moves for summary judgment on the grounds that: (1) FiberMark has not precisely expressed the character and scope of its claimed trade dress; (2) FiberMark's claimed trade dress lacks secondary meaning; and (3) FiberMark's claimed trade dress is functional.

To succeed on a trade dress infringement claim, Plaintiff must show: (i) that its trade dress is entitled to protection under the Lanham Act; and (ii) that Defendant's dress infringes on Plaintiff's dress by creating a likelihood of confusion. Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir. 1997). "To be entitled to protection under the Act, plaintiff's trade dress must either be inherently distinctive or be shown to have acquired distinctiveness through 'secondary meaning.'" Id. (quoting Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 774 (1992)). Even if Plaintiff can demonstrate that its trade dress is entitled to protection, there will be no liability if the feature is functional. Landscape Forms, 113 F.3d at 377. In undertaking the necessary analysis, we must bear in mind the "strong federal policy in favor of vigorously competitive markets," and "the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." Id. at 375, 379.

The following except from the Second Circuit compiles the legal issues relevant to this case:

> We exercise "particular 'caution,'" when extending protection to product designs." Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2d Cir. 1997) (quoting Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d Cir. 1995)). Although the Lanham Act protects marks that "consumers are likely to rely upon in distinguishing goods," Landscape Forms, 113 F.3d at 380, "almost invariably, even the most unusual of product designs such as a cocktail shaker shaped like a

penguin, is intended not to identify the source" of the product, "but to render the product itself more useful or more appealing," [Wal-Martt Stores v.] Samara Bros., 529 U.S. [205,] 213, 120 S.Ct. 1339 (2000). See Restatement (Third) of Unfair Competition § 16 cmt.b at 159 (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods."). And trade dress claims raise a potent risk that relief will impermissibly afford a level of "protection that would hamper efforts to market competitive goods." Landscape Forms, 113 F.3d at 380; see id. at 379 ("[T]he Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets."); Jeffrey Milstein, 58 F.3d at 33. While most trademarks only create a monopoly in a word, a phrase, or a symbol, "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." Landscape Forms, 113 F.3d at 380.

A plaintiff asserting trade dress rights in the design of a product is therefore required to surmount additional hurdles. In any action under § 43(a), the plaintiff must prove (1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's. See Samara Bros., 529 U.S. at 210, 120 S.Ct. 1339. Where the mark is a word, symbol or even product packaging, the plaintiff may prove distinctiveness by showing either that the "intrinsic nature" of the mark serves to identify a particular source (what is known as "inherent distinctiveness") or that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself" (what is known as "acquired distinctiveness" or "secondary meaning"). Id. at 210-11, 120 S.Ct. 1339. The product design plaintiff, however, must always make the second, more difficult showing. See id. at 213-14, 120 S.Ct. 1339 ("Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.").

Moreover, even a showing of secondary meaning is insufficient to protect product designs that are overbroad or "generic"--"those that 'refe[r] to the genus of which the particular product is a species'." Jeffrey Milstein, 58 F.3d at 32, 33 (quoting Two Pesos, 505 U.S. at 768, 112 S.Ct. 2753). . . .

A final doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is "not functional." See Trademark Amendments Act of 1999 § 5, Pub.L. 106-43 (August 5, 1999), codified at 15 U.S.C.A. § 1125(a)(3) (West Supp.2001). (Prior to the congressional directive, this element was an affirmative defense in this circuit. See, e.g., Jeffrey Milstein, 58 F.3d at 31.) " '[A] product feature

> is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, ---, 121 S. Ct. 1255, 1261, 149 L. Ed.2d 164 (2001) (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165, 115 S. Ct. 1300, 131 L. Ed.2d 248 (1995)) (other internal quotation marks omitted).  And in cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively " 'would put competitors at a significant non-reputation-related disadvantage.' " TrafFix Devices, 121 S. Ct. at 1261 (quoting Qualitex Co., 514 U.S. at 165, 115 S. Ct. 1300). Thus, the nonfunctionality requirement "protects competition even at the cost of potential consumer confusion." Landscape Forms, 113 F.3d at 379-380.

Yurman Design, 262 F.3d at 114-16.

### a.     Whether Plaintiff Has A Trade Dress Entitled To Protection

The Lanham Act defines the term "trademark" as "any word, name, symbol, or device, or any combination thereof . . . [used] to identify and distinguish [a manufacturer's] goods . . . from those manufactured . . . by others and to indicate the source of the goods." 15 U.S.C. § 1127.  This definition includes not only source-identifying words or marks, but "trade dress." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001).  Trade dress may include the packaging (*i.e.*, dress) of a product or "the design or configuration of the product itself." Id.

A Plaintiff must articulate and support its claimed trade dress with sufficient particularity. Landscape Forms, 113 F.3d at 381.  Plaintiff must identify "*the specific elements* which comprise its distinct dress." Yurman Design, 262 F.3d at 117.  Even where the claimed trade dress is of "works that are decorative or artistic [and] may be harder to capture in words, and may need descriptions more broadly framed, or may need drawings[, Plaintiff] . . . must nonetheless be able to point to the elements and features that distinguish its trade dress." Yurman Design, Inc., 262 F.3d at 117.

Here, Plaintiff points to the overall look of its mottled product and, in light of the difficulty of describing in words its claimed trade dress, points to pictures of its product (copies of which are in the record). The Court finds that there are triable issues of fact on this issue. One the one hand, Plaintiff's mottled look is not uniform from product to product. Moreover, a certain degree of mottling is a necessary consequence of producing Type I pressboard (or any paper product). There also is some indication that other manufacturers (albeit outside the United States) produce Type I pressboard with a mottled look. These factors tend to suggest that the claimed trade dress is not distinctive, but more generic.

On the other hand, a reasonable trier of fact could conclude that there is an overall, consistent look (albeit, not identical) from production to production. Further, there is evidence that Plaintiff intentionally manufactures its Type I product to enhance and/or achieve a certain mottling effect and that Plaintiff only distributes that product that is rated as a 4 or 5. Moreover, the fact that Defendant apparently intentionally copied the mottled look to appease the converter's desires to have a product that resembled Plaintiff's supports a finding that the mottled look is distinctive and has achieved secondary meaning. See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992). A conclusion that the mottled look has acquired secondary meaning also can be supported by Plaintiff's sales success, the length of time Plaintiff has been using the mottled look (over 100 years), and the fact that no other manufacturer in the United States has a similar looking product.[4]

---

[4] There is some evidence in the record that some non-United States-based manufacturers have a mottled look on their Type I product. Neither party, however, has identified the relevant market and whether it should include foreign manufacturers. Because this matter is presented on Defendant's motion for summary judgment, the Court will look at the record in the light most favorable to Plaintiff and assume that the relevant market is that of the United States only. There is no evidence in the record of any sales to foreign converters.

In light of these competing factors, the Court finds that there is a triable issue of fact on whether the mottling is sufficiently distinctive to qualify as a protectable trade dress.

### b. Whether the Mottled Trademark is Functional

As previously noted, even if the trade dress apparently is distinct, there will be no protection under the Lanham Act if the trade dress is functional. To reiterate, "'a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" TrafFix Devices, Inc., 121 S. Ct. at 1261 (quoting Qualitex Co., 514 U.S. at 165) (other internal quotation marks omitted).

An argument can be made that the mottled look is functional in that it is (to a degree) a necessary by-product of the manufacturing process. If the degree of mottling that appears on Plaintiff's product is the necessary results of the manufacturing process, then granting trade dress protection would be inappropriate because, essentially, it would be giving Plaintiff a monopoly on the manufacture of Type I pressboard. Yurman, 262 F.3d at 116.

In another sense, however, it is unclear whether the extent and type of mottle (or the appearance of such mottle) on Plaintiff's products is the necessary result of the manufacturing process. Further, it is unclear whether the mottled look is "essential to the use or purpose of the" pressboard or that it affects the cost or quality of the pressboard. There is evidence in the record that the mottled look could be minimized or appear differently without sacrificing quality. Moreover, it appears that Plaintiff takes care, through the selection of raw materials, dyes, etc. to enhance the mottled appearance on its product, thereby providing a basis upon which it could be concluded that Plaintiff's particular mottled look is different than that which is the natural by-product of the manufacturing process. This case presents an

extremely close call. Given these factual disputes and the different factual conclusions that can be drawn from the evidence in the record, this issue is inappropriate for summary judgment.[5]

## V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED. There are triable issues of fact whether Plaintiff's trade dress is sufficiently distinctive such that it has acquired secondary meaning and whether the trade dress is functional. Defendant did not move for summary judgment on the issue of the likelihood of confusion and, thus, that issue too also remains outstanding for trial on the Lanham Act claim.

IT IS SO ORDERED.

Dated: May 11, 2005

_Thomas J. McAvoy_
Thomas J. McAvoy
Senior, U.S. District Judge

---

[5] The Court notes that a similar case involving the exact same trade dress is pending in the District of Massachusetts. See FiberMark, Inc. v. Merrimac Paper Co., Inc., No. 01-cv-11159 (D. Mass.). In a Report and Recommendation dated March 10, 2003, the Magistrate Judge in that case recommended that the defendant's motion for summary judgment be denied. On April 29, 2005, the District Judge adopted the Report and Recommendation.

The issues in that case are virtually identical to those presented in this case. This Court has reviewed the Report and Recommendation (as adopted by the District Judge) and, except to the extent that the decision in that case relies on facts not in the record in this case and discusses issues not presented on the instant motion for summary judgment, adopts the legal reasoning therein.