UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**FIBERMARK, INC.,**

        **Plaintiff,**

 vs.              CIVIL ACTION
                     7:02-CV-0517-TJM-DEP

**BROWNVILLE SPECIALTY PAPER PRODUCTS, INC.,**

        **Defendant.**

---

Thomas J. McAvoy,
Sr. U.S. District Judge

**DECISION & ORDER**

**I. Introduction**

  On December 9, 2005, this Court ordered a new trial on the anti-dilution claim due to the inconsistent jury verdict. See FiberMark, Inc., v. Brownville Specialty Paper Prods., Inc., 2005 WL 3359077 (N.D.N.Y. Dec. 9, 2005), familiarity with which is presumed.  On January 4, 2006, upon Defendant's letter motion, this Court ruled that (1) Plaintiff is not entitled to a jury trial on the anti-dilution claim, (2) the Court will determine the anti-dilution claim without taking any additional testimony because the parties failed to identify any new, non-cumulative evidence that would be presented in a new trial, and (3) the parties shall submit proposed findings of fact and conclusions of law supported by citations to the official trial transcript on or before January 22, 2006.

  Following the order, Plaintiff FiberMark ("FiberMark") filed two letter motions requesting that the Court reconsider its January 4, 2006 order and that the Court admit into the record for the

1

retrial the registration of FiberMark's Mottled Trade Dress with the United States Patent and Trademark Office ("PTO") or alternatively take judicial notice of the registration.

## II. Facts

FiberMark and Brownville are both in the business of producing paper for office and school supply manufacturers. One of FiberMark's paper products is pressboard. Pressboard is a dense, rigid form of paperboard, categorized based on density, rigidity, and finish. Three grades of pressboard are known as Type I, Type II, and Type III. Type I is the most dense and rigid grade of pressboard. Currently, FiberMark is the only manufacturer of Type I pressboard in the United States. FiberMark's Type I pressboard is known as Genuine Pressboard™. When a clear acrylic coating and leather grain embossing are added, it is known as PressGuard®. Pressboard manufacturers sell their products to converters. Converters purchase the pressboard and then convert it into a finished good (such as file folders, three-ring binders, file folders, notebooks, report covers) for sale to retailers.

FiberMark Type I pressboard products have a mottled appearance. Mottle is a common characteristic of all paper products, including Type I, II, and III pressboards. However, the FiberMark Mottle differs from the mottle on other pressboards because it is more distinct, consistent, linear, and easy to see. FiberMark and its predecessors have been the only manufacturers and suppliers of Type I pressboard bearing the FiberMark Mottle. FiberMark produces the FiberMark Mottle on its Type I pressboard by controlling inputs and processes such as the selection of pulps, secondary fibers, and dyes, the monitoring of the wet end of the machine, and the control of the pressing, drying, surface sizing, lamination and moisturizing process, and the glazing operation. FiberMark uses a quality control standard to ensure that the resulting product has

the unique and recognizable FiberMark Mottle. Indeed, there was testimony in the record that the converters recognized the mottle in FiberMark Type I pressboard as unique and distinctive. Tr. 224:16-23, 428:9-19, 435:9-13, 644:22-23, 654:20-655:1, 11. FiberMark has promoted the mottled appearance of its Type I pressboard products through advertising, other promotional materials, and a cooperative marketing program with its converters on which it spends over $100,000 per year. As a consequence, FiberMark's Mottle is well-known, recognized and accepted in the market for pressboard products (among the converters).

Brownville does not produce a Type I pressboard. Instead, it produces what it claims to be Type II ½ coated and embossed pressboard product with a marbled and mottled appearance printed thereon (the Mansfield Cover®). By definition, Brownville's product is an imitation pressboard. When Brownville was developing a pressboard product to compete with FiberMark's Type I pressboard, ACCO, one of the largest converters, told Brownville that the Mansfield® Cover should have a mottled appearance. Tr. 664:9-20. Subsequently, the now President and General Manager of Brownville, Eugene Rood, went to an office supply store and purchased several products with a mottled appearance.[1] Rood then sent those samples to a graphics company and asked the company to come up with a similar pattern or effect as the samples provided. The graphics company took a picture of the samples and used that picture to develop a print roll that would create the mottled appearance on the Mansfield Cover®. Unlike FiberMark's Type I pressboard, the mottled appearance on the Mansfield Cover® is not a result of the manufacturing process, but is printed on the product after the manufacturing process is completed. Brownville's products do not have the same technical specifications as FiberMark's Type I products. All the companies to which

---

[1] It appears that Rood purchased FiberMark products.

3

Brownville marketed its Mansfield® Cover were customers or potential customers, i.e. converters, of FiberMark.

**III. Standard**

Only equitable relief is available under the New York anti-dilution statute. N.Y. Gen. Bus. L. § 360-l. Accordingly, Plaintiff is not entitled to a jury trial. Empress Cubana Del Tabaco v. Culbro Corp., 123 F. Supp. 2d 203, 210 (S.D.N.Y. 2000); see also S.E.C. v. Tome, 833 F.2d 1086, 1096 n. 7 (2d Cir. 1987).

As the trier of fact and law in this case, the Court must determine whether Plaintiff has met its burden by a preponderance of evidence. See Savin Corp. v. Savin Group, 391 F.3d 439, 449 (2d Cir. 2004). Under this standard, the party whose evidence is more convincing than the evidence in opposition to it, i.e. the party who proffers evidence which as a whole shows that the fact sought to be proved is more probable than not, prevails.

**IV. Discussion**

The sole issue upon retrial pertains to Plaintiff's anti-dilution claim pursuant to New York General Business Law § 360-l (formerly § 368-d). Section 360-l states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

This section applies "with equal force to the protection of trade dress." Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 73 (2d Cir. 1994).

To prevail on this claim, Plaintiff must prove, first, that its trade dress is of truly distinctive quality or has acquired secondary meaning, and, second, that there is "likelihood of dilution." Id.

(citing Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 625 (2d Cir. 1983)).  The likelihood of confusion is not a necessary element of this claim.  Sally Gee, Inc., 699 F.2d at 625.

**A. Secondary Meaning**

"New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive." NYSE, Inc. v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002).  Here, FiberMark does not contend that its alleged trade dress is inherently distinctive.  Rather, it contends that its mottle has acquired secondary meaning.  "A mark acquires secondary meaning when '[it] [is] shown that the *primary* significance of the [trade dress] in the minds of the consuming public is not the product but the producer." Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1221 (2d Cir. 1987) (quoting 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 815 F.2d 8, 10 (2d Cir. 1987)).  "[T]he crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods but the source of those goods,' even though the relevant consuming public might not know the name of the producer." Id.  "The focus of secondary meaning therefore is the consuming public. . . . Although the mark owner strives to create a secondary meaning for its product, it is the consuming public which, in effect, determines whether that effort has succeeded." Id.  To determine whether a trademark has a secondary meaning, courts assess the following factors:[2] "'(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and

---

[2] At trial, this Court gave eight factors deriving from the six factor test in Mana Prods.  Trial Tr. at 1599.  However, in their proposed findings of fact and conclusions of law, both Plaintiff and Defendant followed the six factor test in Mana Prods.  To compare which side proved their claims by a preponderance of evidence, this Court adopts the six factor test here and analyzes each factor.

exclusivity of the mark's use.'" Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc., 65 F.3d 1063, 1071 (2d Cir. 1995) (quoting Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987)).

In the December 9, 2005 decision, this Court held that the consuming public in this case is the converters. Sitting as the trier of fact, the Court again finds that converters are the consumers of the parties' products. Based on an analysis fo the following factors, the Court find that Plaintiff's mottle has acquired secondary meaning among converters.[3]

**1. Advertising Expenditures**

The advertising expenditures the Court considers for this factor are the expenses by FiberMark in its efforts to "link a product with its mark." Coach, Inc. v. We Care Trading Co., Inc., 2002 WL 32103175 at 3 (2d Cir. May 20, 2002). It is unrefuted that FiberMark spent considerable amounts of money in advertising and promoting the Type I pressboard. Whether these efforts were just to promote the sales of the product or to link the product with its mark is unclear. What is clear, however, is that FiberMark also established cooperative marketing programs with Converters in promoting its Type I pressboard products and in doing so, promoted the FiberMark Mottle and linked the mottled appearance with its Genuine Pressboard™ and PressGuard® products. Brownville does not refute any of FiberMark's efforts in promoting its products and the mark. Rather, it only points out that FiberMark's advertisement is directed at its sophisticated customers, such as converters, and not the end-users. Because the Court finds the converters to be the relevant

---

[3] This finding that FiberMark Mottle has acquired a secondary meaning is not contradictory to the Court's rejection of judgment as a matter of law that FiberMark Mottle has acquired a secondary meaning in its December 9 decision. The standard of review applied for the motion for JMOL is much higher than the standard employed here.

consumers, FiberMark's advertising aimed at converters is highly relevant. Conversely, because the end-users of the converted products are not the relevant market, it is of little import that FiberMark may not have invested significant advertising expenditures aimed at this group. Accordingly, this factor weighs in favor of FiberMark.

### 2. Consumer Studies Linking the Mark to a Source

Neither party provided any evidence of customer studies. Accordingly, this factor is of little consequence.

### 3. Unsolicited Media Coverage of the Product

FiberMark did not offer any evidence on any unsolicited media coverage of its product. Therefore this factor does not weigh in its favor.

### 4. Sales Success

FiberMark offered evidence that it sold 14,000 tons of its Type I pressboard products in the past three years alone, generating approximately $29 million in revenues. The only evidence Brownville offered in opposition is that FiberMark has experienced continual decreasing sales of its Type I pressboard. However, the reason for the decrease in sales is, as Brownville itself admits, due to changes in the marketplace, such as digital technologies replacing the needs for paper products. The sales decrease had nothing to do with the market recognition or selling power of FiberMark Mottle. Given the success of its sales, this factor weighs in favor of FiberMark.

### 5. Attempts to Plagiarize the Mark

The direct evidence as well as the circumstantial evidence proves to this Court that Brownville sought a mottled appearance identical, or very similar, to that of FiberMark's Type I pressboard. The Brownville officers in charge of developing and marketing the Mansfield® Cover

7

were quite familiar with FiberMark Mottle.  The mottled appearance on the Mansfield® Cover is essentially copied from the samples purchased from a retail store.  Defendant acknowledged that those samples were likely to have been made from FiberMark's products.  The reason Defendant copied the FiberMark Mottle on its product is because a purchasing agent of ACCO, a converter, told Brownville that it could consider purchasing Brownville's pressboard product if the product had a mottled appearance.  Brownville not only attempted to copy, but actually copied, the FiberMark Mottle.  There also is evidence that another FiberMark competitor, Merrimac Paper Company, produced a pressboard product with the FiberMark Mottle in late 1999 or early 2000.  FiberMark brought an action to stop Merrimac from copying.  Given these attempts by Defendant and Merrimac, it is clear to this Court that there have been attempts to copy the FiberMark Mottle due to its recognition in the market.  This factor weighs heavily in favor of FiberMark.

**6. Length and Exclusivity of the Mark's Use**

FiberMark and its predecessors have used the FiberMark Mottle on its Type I pressboard products more than 100 years.  Even though it might not have been the exclusive supplier of pressboard with the distinctive mottled appearance, the evidence indicates that the market perceived FiberMark to be the sole supplier of pressboard bearing the FiberMark Mottle.  Tr. 428:9-19, 435:9-13, 455:1-6, 644:22-23, 654:20-655:1, 784:3-6.  This factor also weighs in favor of FiberMark.

Considering the totality of the circumstances, the Court finds that FiberMark's mottle has acquired secondary meaning among converters.  This conclusion is strongly supported by the fact that, as stated, a converter (ACCO) required Brownville's product to mimic that of FiberMark before it could be marketed as an alternative to FiberMark's product.  Even though there are two factors on which neither party provided any evidence, and the lack of evidence in those factors

might weigh against FiberMark, no single factor is dispositive and, in balance, there is sufficient evidence for this Court to find that FiberMark met its burden of proof in establishing by a preponderance of evidence that its mottled appearance has acquired secondary meaning among converters. Accordingly, the Court finds that FiberMark's mottled appearance is distinctive enough to satisfy the first element of the anti-dilution claim under the New York law.

### B. Likelihood of Dilution: Blurring

The next issue is whether Plaintiff can demonstrate a likelihood of dilution. Courts in this Circuit have defined dilution as "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." Deere & Co. v. MTD Products, Inc., 41 F.3d 39, 42 (2d Cir. 1994) (internal citation omitted). Blurring typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others."[4] Id. at 43 (internal citation omitted). Thus, dilution by blurring is likely to occur when an unauthorized use of the trademark by others raises "the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Id. Courts in this Circuit apply a six factor test (a modified Polaroid test) to find the likelihood of dilution by blurring. Sports Auth. Inc. v. Prime Hospitality Corp., 89 F.3d 955, 966 (2d Cir. 1996) (citing Deere & Co., 41 F.3d at 43 n. 8). Accordingly, this Court adopted the following six factors at trial: (1) the similarity of the dress; (2)

---

[4] The complete quotation includes the phrase "upon dissimilar products" at the end. However, that does not mean that anti-dilution protection does not extend to similar products. The Second Circuit has clearly held that the New York anti-dilution statute is applicable between competitors as well as noncompetitors. Nikon, Inc. v. Ikon, Corp., 987 F.2d 91, 96 (2d Cir. 1993). The Second Circuit also held that "similarity of the products covered by the marks increases the likelihood of blurring." Mead Data Cent., Inc., 875 F.2d at 1036 (internal citation omitted). The phrase "upon dissimilar products" only proves the legislative intent that the protection afforded by section 368-l extends "beyond that provided by actions for infringement and unfair competition." Allied Maint. Corp. v. Allied Mech. Trades, Inc., 42 N.Y.2d 538, 544 (1977).

the similarity of the products cover[ed by the dress]; (3) the sophistication of the consumers; (4) the predatory intent; (5) the renown of the senior mark (the appearance of plaintiff's product); and (6) the renown of the junior mark (the appearance of the defendant's product).  Trial Tr. 1606:3-10. This Court will analyze each factor and balance the factors as a whole.

### 1. Similarity of the Dress

"Dilution is likely only where the junior mark is similar to the senior mark." Mead Data Cent., Inc, v. Toyota Motor Sales, 875 F.2d 1026, 1035 (2d Cir. 1989) (Sweet, J., concurring). "[T]he more similar the marks [are,] the higher the likelihood of dilution [is.]" Id.  The evidence is clear that the mottle on Mansfield Cover looked very much like, if not identical to, the FiberMark Mottle.  Tr. 461:10-20, 462:1-3, 740:17-22.  Even though this Court in the December 9 decision held that the fact that the two marks appear similar is not dispositive and, rather, the question is whether such similarity is more likely than not to cause consumer confusion in the context of the likelihood of confusion, the context is totally different in this case.  See Sports Auth. Inc., 89 F.3d at 966 ("where the classic likelihood of confusion test leaves off, the dilution theory begins.") (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24.13[1][b], at 24-108 (3d ed. 1996)).  Here, the ultimate issue is the likelihood of dilution.  This factor weighs heavily in favor of FiberMark.

### 2. Similarity of the Products Covered by the Dress

"Similarity of the products covered by the [dress] increases the likelihood of blurring." Mead Data Cent., Inc., 875 F.2d at 1036 (citation omitted).  It is more difficult to establish blurring "when the junior mark appears on a product substantially different from the plaintiff's."  Id (citation omitted).  Here, Plaintiff's product and Defendant's product are, though of a different quality,

10

substantially similar. In fact, Brownville promoted the Mansfield® Cover to its customers or potential customers as an "alternative" to FiberMark's Type I pressboard products. Plaintiff's product and Defendant's product have the same pool of consumers (converters) for the similar, if not exactly identical, purposes (manufacturing binders or notebooks). Therefore, this factor weighs in favor of FiberMark.

### 3. Sophistication of the Consumers

"Where the plaintiff's consumers are sophisticated, there is a reduced likelihood that a junior mark will blur the senior mark's selling power." Mead Data Cent., Inc., 875 F.2d at 1036 (citation omitted). In fact, this Court considered this factor as the most important factor in upholding the jury's verdict that there was no likelihood of confusion. However, this factor requires a different treatment in the context of the likelihood of dilution, especially when this Court takes into account the fact that there is evidence that the converters make their purchase decision based on the mottled appearance (which is the protected trade dress in this case). The individual factors in the trade dress infringement claim have to be analyzed under the ultimate question of whether such a factor is likely to cause confusion.[5] Brennan's, Inc. v. Brenna's Restaurant, L.L.C., 360 F.3d 125, 133-134 (2d Cir. 2004).

Here, the ultimate question is whether each factor is likely to cause dilution. Despite the cases where courts have found less likelihood of blurring when consumers were sophisticated, all

---

[5] The Second Circuit does not blindly apply the sophistication factor in the likelihood of confusion analysis. Even though the Court notices that generally the more sophisticated the consumers are, the less likely that there would be confusion, it recognizes that sophistication "might on occasion *increase* the likelihood of confusion, depending upon the circumstances of the market and the products." Paddington Corp. v. Attiki Imps. & Distrib., Inc., 996 F.2d 577, 587 (2d Cir. 1983) (citing Centaur Communications, Ltd. v. A/S/M Communications, Inc, 830 F.2d 1217, 1228 (2d Cir. 1987)).

11

those cases involve a situation where the sophistication of consumers was likely to reduce dilution. E.g., Mead Data, 875 F.2d at 1037 (holding that blurring of the LEXIS service is unlikely within the sophisticated consumers - primarily lawyers and accountants, by Toyota's use of LEXUS on its new model); Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 73 (2d Cir. 1994); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 220-221 (2d Cir. 1999). Here, the sophistication of consumers is not likely to reduce dilution because of the peculiar situation in this case. Converters want pressboard products with a mottled appearance because they think that is what the end-users want. The record shows that converters considered Brownville's Mansfield cover only if it had a mottled appearance similar to FiberMark's Type I pressboard. Stated otherwise, the converters encouraged dilution because that would enable them to purchase what they want (a pressboard product with FiberMark Mottle for less money) without losing their customers (end-users who, they believe, want finished products with a mottled appearance). In this situation, the selling power of the FiberMark Mottle is likely to be "whittled away" in the converter market. Although the relevant consumers are sophisticated, the sophistication is not likely to reduce the dilution. In fact, the collusive acts between converters and Defendant is likely to increase the likelihood of dilution. Therefore, this factor does not weigh in favor of Brownville.

### 4. Predatory Intent

"The likelihood of blurring is increased where the junior user acts with predatory intent." Id. Predatory intent is shown when "the junior user adopted its mark hoping to benefit commercially from association with the senior mark." Id. (citation omitted). Brownville argues that it acted innocently because its intent "was not to confuse ordinarily prudent purchasers, but rather to respond to the demands of potential customers (e.g., converters) for less expensive alternatives to

Type I pressboard." Defendant's Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial, at 11. Responding to customers' request to copy a protected trade dress does not excuse Brownville from liability. There is no doubt that, despite the fact that Brownville could have used a different design on its Mansfield cover, it intentionally copied an appearance substantially similar to that of the FiberMark Mottle. Further, Brownville intended its Mansfield cover to be used by the same customers as FiberMark's Type I pressboard as "less expensive alternatives." The predatory intent is clear and this factor weighs strongly in favor of FiberMark.

### 5. The Renown of the Senior Mark

This factor requires evaluation of a "mark's strength with reference to the distinctive quality of the mark or its secondary meaning." Mead Data, 875 F.2d at 1038. With respect to this factor, Plaintiff argues that the finding of a secondary meaning in the mottled appearance is dispositive of this factor while Defendant refutes that argument. This Court agrees with Defendant in that "strength" and "secondary meaning" are distinct legal concepts. However, that issue does not have to be address any further, because Defendant acknowledged that "FiberMark offered evidence that the mottled appearance of its Type I pressboard products is recognized in the office supply manufacturing industry among converters." Defendant's Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial, at 9. That is sufficient to hold that this factor weighs in favor of FiberMark because the relevant consumer group in this case is the converters and the FiberMark Mottle is a strong trade dress among them.

**6. The Renown of the Junior Mark**

Both parties agree that no evidence was proffered as to this factor and there is no argument as to in whose favor this factor weighs in. Therefore, the Court find this factor to be neutral.

In balancing the factors, this Court finds that none of the factors weighs in favor of Defendant, whereas three factors clearly weigh in favor of Plaintiff and the other two somewhat in favor of Plaintiff. The Court, therefore, finds that Brownville's sales of Mansfield cover is likely to dilute FiberMark's protected trade dress of the mottled appearance through blurring. Because Plaintiff has proved the likelihood of dilution by blurring, the Court does not discuss the tarnishment issue.

**C. Injunctive Relief**

The only remedy available under §360-l is injunctive relief. Permanent injunctive relief is available where (1) the plaintiff succeeds on the merits, (2) there is a lack of an adequate remedy at law, and (3) the balance of the equities favors the entry of a permanent injunction. See Blue Sky Entm't, Inc. v. Town of Gardiner, 711 F. Supp. 678, 690 (N.D.N.Y. 1989); Smithkline Beacham Corp. v. Procter & Gamble Co., 591 F. Supp. 1229, 1235 (N.D.N.Y. 1983), aff'd 755 F.2d 914 (2d Cir. 1985); Sierra Club v. Alexander, 484 F. Supp. 455, 471 (N.D.N.Y. 1980).

Here, FiberMark has succeeded on the merits by proving that the FiberMark Mottle acquired secondary meaning and there is a likelihood of dilution by blurring. There is no adequate remedy at law under §360-l because the only remedy available under that section is an injunction. Finally, the balance of the equities favors an injunction. Unlike the FiberMark Mottle which appears as a result of the manufacturing process, Brownville's imitation mottle appears as a result of printing after the manufacturing process is over. The only change Brownville has to make in response to this

permanent injunction is stop printing the FiberMark Mottle on its finished products.

It is therefore

**ORDERED** that pursuant to Fed. R. Civ. P. 65(d) and New York Gen. Bus. Law §360-l, Defendant Brownville Specialty Paper Products, Inc and its affiliates are **permanently enjoined** from using a mottle that is similar, or identical, to FiberMark's protected trade dress.

**IT IS SO ORDERED.**

Dated: March 13, 2006

_____
Thomas J. McAvoy
Senior, U.S. District Judge